From the foregoing facts the register decides that said proof ought not to be modified and that it stand as a secured claim as proved.

[The register would recommend, if the court sustain the ruling of the register, that the parties be ordered to proceed in the county court, where said cause is pending, and ascertain by the judgment of that court the amount due from the said A. T. Keith to the said J. Q. A. Peck, embraced in said suit, provided this can be done so as not to cause an unreasonable delay in settling the estate of the bankrupt in the district court. So that if there is more due from the said A. T. Keith than sufficient to liquidate the plaintiff's claim in that suit, the balance may be available to the assignee in the bankrupt's estate.

[All which is respectfully submitted.] 2

[By JOHN L. EDWARDS, Register:

[Since said report was recommitted to me, such proceedings have been had in the county court in Washington county, where said cause is pending, that the amount in the hands of the trustee has been fixed upon, and that amount it is agreed by counsel is four thousand three hundred and sixteen dollars and three cents, less trustee's costs, taxed and allowed at nine dollars and five cents, leaving in the hands of said trustee on which said lien is claimed four thousand three hundred and six dollars and ninety-eight cents. All which is respectfully submitted.]

Chas. H. Heath and H. W. Heaton, for creditor.

C. W. Porter, for assignee.

WHEELER, District Judge. With reference to the question certified in this cause by the register, it seems that the bankrupt act expressly saves liens by attachment on mesne process, made the prescribed length of time before proceedings in bankruptcy, from being dissolved by them. The attachment of a debt by trustee process in this state creates a lien that is so saved. Stoddard v. Locke, 43 Vt. 574. That has not been questioned in argument here, but it is insisted that to perfect the lien so that the time would begin to run, there should be service upon or at least actual notice to the principal debtor. But this is governed by a positive provision of the law that applies exactly to the cases described in it and to no others, and leaves no room for construction. The state law under which the lien is created does not require service on nor notice to the defendant in the process, to have the lien attach. Service on the trustee is sufficient for that, if the subsequent proceedings are followed out to judgment. After service on the trustee the lien on the funds in his hands exists and is valid, unless there is some lapse in the proceedings that discharges him from them. This lien is a lien by attachment on mesne process

from the beginning and falls within the description of those saved by the bankrupt act; and the holder of it appears to be entitled to have it saved under the act. Such an attachment is of itself a sort of constructive notice to the defendant, the same as an attachment of chattels is. For by looking after his debt he would find that attached in the hand of his debtor, as by looking after his chattels he would find them attached in the custody of the officer.

For these reasons this court is of the opinion that the decision of the register is correct.

---

## Case No. 10,887.

### In re PECK.

[3 N. B. R. 757 (Quarto, 186).] 1

District Court, S. D. New York. April 26, 1870.

BANKRUPTCY — CERTIFICATION OF QUESTIONS NOT MATERIAL TO POINTS IN ISSUE.

Where an action had been commenced in the superior court of Connecticut against a firm doing business in New York, attachment laid, judgment recovered, and execution issued, without the consent or privity of said firm, in part for money loaned, and the balance upon promissory notes for money loaned, a portion of which (about fifteen thousand dollars) fell due subsequent to the commencement of said action, Q. 1. Is it lawful for the plaintiff to continue his action in said superior court for the purpose of condemning the property attached, and for perfecting his lien thereon—or is it the duty of plaintiff to discontinue said action? 2. Is it the duty of the plaintiff to release said lands from the lien of said attachment? 3. Ought plaintiff to amend his deposition for proof of debt, and, if so, in what manner? 4. Ought the real estate attached to be sold subject to the lien thereon, and, if so, in what manner? *Held,* the questions are not certified by the register as being upon any point or matter which has arisen in the course of proceedings before him, and are not within the first subdivision of section 6 [of the act of 1867 (14 Stat. 520)].

By ISAAC DAYTON, Register: I, Isaac Dayton, one of the registers of said court in bankruptcy, do hereby certify that in the course of the proceedings in said cause before me, the following questions arose pertinent to said proceedings, and were, by Charles N. Judson, Esq., attorney and counsel for John J. Cisco, one of the creditors of said bankrupt, stated for the opinion of the court thereon. The facts, as submitted to me, are as follows: On the 10th day of June, 1868, John J. Cisco, of the city of New York, commenced an action in the superior court of the state of Connecticut against Bronson Peck, then doing business in said city of New York, under the firm name of Bronson Peck & Co.; and on the 11th day of June, 1868, attached certain lands situated at Greenwich, in the state of Connecticut, valued at less than fifteen thousand dollars, as the property of said Bronson Peck. That said Bronson Peck had, for ten years prior to the

---

2 [From 16 N. B. R. 43.]

1 [Reprinted by permission.]

commencement of said action, carried on business in said city of New York, either in his own name, or under the firm name of Bronson Peck & Co.; and that at the time of the commencement of said action, said John J. Cisco was aware that said Bronson Peck and said Bronson Peck & Co. were in an embarrassed condition in their business matters. That in October, 1868, said John J. Cisco recovered judgment in said action by default against said Bronson Peck for the sum of forty-three thousand eight hundred and ninety-eight dollars and four cents, or thereabouts; and thereupon, to wit, on the 15th day of October, 1868, the aforesaid lands were set off, in accordance with the laws of the state of Connecticut, on execution issued upon said judgment against said Bronson Peck, at a valuation of seven thousand two hundred and twenty-five dollars. The sheriff's fees on said execution being the sum of one hundred and fifty-five dollars and seventy-two cents. That said action was commenced, said attachment was laid, said judgment was recovered, and said set-off was made, without the consent or privity of said Bronson Peck, or said Bronson Peck & Co., and without any collusion or connivance on his or their part. That the debt for which said judgment was recovered, and the lands set off, as aforesaid, was in part for money loaned said Bronson Peck, or said Bronson Peck & Co., and the balance upon promissory notes given for money loaned said Bronson Peck, or said Bronson Peck & Co., a portion of which latter, to wit, of the sum of fifteen thousand dollars, or thereabouts, fell due subsequent to the commencement of said action, but prior to October 1st, 1868. That at the commencement of the December term, in the year 1868, of said superior court of Connecticut, a motion was made in behalf of said Bronson Peck to open said judgment, and to permit said Peck to defend said action, and afterwards, to wit, on or about the 1st day of March, 1869, said judgment was opened, vacated, and set aside upon condition of trial upon the merits, and no plea in abatement to be filed or received. And that said action is now upon the calendar of said superior court, waiting to be tried, but the trial thereof is delayed by injunctions from said superior court, obtained by said Bronson Peck, or by his assignee in bankruptcy, John Todd; and that the attachment on said land is still undischarged of record. That on the 31st day of December, 1868, and more than six months after the commencement of the action as before set forth, said Bronson Peck filed his petition in this court to be declared a bankrupt, and thereafter, on said petition, was duly declared a bankrupt, and on the 2d day of March, 1869, John Todd was appointed assignee of the effects and estate of said bankrupt; and on the 13th day of March, 1869, said assignment was duly recorded in the record office of the town of Greenwich, state of Connecticut aforesaid.

That on or about the 16th day of February, 1869, and prior to the decision of the motion to open said judgment, as hereinbefore set forth, said John J. Cisco made and filed with the register in charge of said bankruptcy, his deposition for proof of debt without security, alleging therein, "That Bronson Peck, the said bankrupt, is justly and truly indebted to him in the sum of thirty-six thousand eight hundred and twenty-eight dollars and seventy-six cents, and interest from October 15, 1868, being the amount unpaid of a judgment obtained in the superior court of the state of Connecticut, by him against the said bankrupt, said judgment so recovered being for the sum of forty-four thousand and fifty-three dollars and seventy-six cents, recovered October 15, 1868, of which the sum of seven thousand two hundred and twenty-five dollars was paid upon an execution issued upon said judgment." That said amount so alleged to be due included the amount of the sheriff's fees on execution in the set-off as aforesaid; and that said proof of debt was made in good faith, and in the belief that the recovery of the judgment and the set-off of the lands aforesaid were valid and legal proceedings under the laws of the state of Connecticut. That on the 4th day of January, 1870, said Bronson Peck received from the district court of the Southern district of New York a discharge from all his debts. That said John J. Cisco has offered to have the value of said real estate ascertained by agreement with said assignee, or to have the same sold subject to his lien, if any he may have thereon, and to have his deposition for proof of debt amended in accordance with the facts hereinbefore set forth, but said assignee has refused to assent thereto. That in accordance with the first division of the 6th section of the act entitled, "An act to establish a uniform system of bankruptcy throughout the United States," the said John J. Cisco asks the opinion of the court as to his duty in the premises.

The question of law submitted for the opinion of the court is as follows: "First. Is it lawful for said John J. Cisco to continue his said action in said superior court for the purpose of condemning the property attached as aforesaid, and for the purpose of perfecting his lien thereon, or is it the duty of said Cisco to discontinue said action? Second. Is it the duty of said John J. Cisco to release said lands from the lien of said attachment? Third. Ought the said John J. Cisco to amend his deposition for proof of debt, and, if so, in what manner? Fourth. Ought the real estate attached as aforesaid to be sold subject to the lien of said John J. Cisco thereon, and, if so, in what manner? John J. Cisco, by Charles N. Judson, his Attorney, 167 Broadway, N. Y."

BLATCHFORD, District Judge. The within questions are not upon any point or mat-

ter which has arisen in the course of any proceedings before the register, and are not so certified by the register. They are, therefore, not within the first subdivision of section 6.

## Case No. 10,888.
### PECK'S TRIAL.

[This was an impeachment proceeding, and was tried before the senate of the United States.]

PECK (ARNOLD v.). See Case No. 561a.

## Case No. 10,889.
### PECK et al. v. BURNS et al.
#### [5 Ben. 537.] [1]

District Court, S. D. New York. Feb., 1872.

COLLISION AT SEA—STEAMER AND BARK — LIGHTS —CHANGE OF COURSE OF BARK.

1. The bark C. was sunk in a collision with the steamer K., at sea, about 240 miles from New York, the collision occurring about 7:30 p. m., on September 1st, 1864. The bark was sailing nearly west, with the wind northeast, at a speed of about seven knots an hour. The steamer's course was nearly east. The bark had no lights set, but she was seen on the port bow of the steamer, whose helm was at once ported. Her helm was then put hard aport, and her engine was stopped and backed, because the officer in charge saw that the bark had starboarded. The bark did starboard after she saw the steamer, and the excuse given for it was, that she saw the steamer's white and green lights about a point on her starboard bow, and did not see the steamer making any change. *Held*, that, as the officer in charge of the steamer saw the bark on his port bow, coming on a parallel course, it was not wrong for him to port.

2. On the evidence, the bark starboarded after the steamer had ported. It was a fault in her to so change her course.

3. Having changed her course, it was not for her to criticise closely the movements of the steamer in extremis, and she must make out satisfactorily that it was wrong for the steamer not to steady or starboard, instead of continuing to port.

4. She had failed to establish this, and must be held in fault for the collision.

[This was a libel by William M. Peck and others against John Burns and others to recover damages for the loss of libellants' vessel, caused by a collision with respondents' steamship.]

W. Tracy, for libellants.
D. D. Lord, for respondents.

BLATCHFORD, District Judge. On the 1st of September, 1864, at about half past 7 o'clock, p. m., the bark Czarina, while on a voyage from Palermo, in Sicily, to New York, and the steamship Kedar, while on a voyage from New York to Liverpool, came into collision with each other, about 240

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

miles from New York, the steamer, with her stem, striking the starboard side of the bark. The bark soon sank, with her cargo, her crew being saved. The libellants, as owners of the bark, bring this suit to recover for the loss of the vessel and of her charter money for the voyage.

The libel alleges, that the bark was sailing, on a northeasterly wind, on a course nearly due west, and at the rate of about seven knots an hour; that the steamer was on a course nearly east; and that the collision was occasioned by the improper and unskilful and negligent management of those navigating the steamer, in not avoiding the bark.

The defence, on the merits, on the part of the steamer, is, that the bark was discovered a very short distance ahead of the port bow of the steamer; that it was after dark; that the steamer had her usual lights set, namely, a white light at her masthead, a green light on her starboard side, and a red light on her port side, all of which were burning brightly; that the bark took no measures to warn the Kedar of her proximity; that the bark had no lights set, and no lookout; that she was not discovered until she was just ahead of the steamer's port bow; that, as soon as she became visible from the steamer's forecastle, she was reported by one of the lookouts, and the steamer's helm was immediately put hard aport, and her engines were reversed; that the steamer had two men stationed as lookouts on her forecastle, and officers and men stationed on deck and in the engine room, in such manner as to change her course, or stop her almost instantly, on the approach of danger; and that the collision happened through the carelessness and mismanagement of those in charge of the bark, and especially by reason of their omission to set the lights usual in sailing vessels, and of their omission to show a light to warn the steamer of the approach of the bark, after the steamer's lights became visible, and of their omission to set a proper lookout, and of their putting the helm of the bark astarboard shortly before the collision.

It is very much to be regretted that the testimony of the witnesses in this case, on both sides, was not taken at an earlier day after the collision, when their recollections were more to be relied on. The witnesses from both vessels have been examined by depositions in writing. Although the collision happened on the 1st of September, 1864, the libel was not filed until the 7th of February, 1866. The witnesses from the steamer comprise eight persons, all of whom were examined in May, 1868. The witnesses from the bark comprise three persons, one of whom (Morse) was examined in September, 1869, the second (Peavey) in February, 1870, and the third (Cotter) in July, 1870.

Goffin, the chief officer of the steamer, was the officer of the deck, and on the